Our third case for this morning is Priscilla Rainey v. Jayceon Taylor. Mr. Williams. Mr. Williams Yes, may it please the court, your honors. Good morning, your honors. Andrew Williams here on behalf of the appellant, Jayceon Terrell Taylor. Before I begin, your honors, just let me state that it is both an honor and privilege to stand before you this morning in this court today. It is our opinion that the issues that will be discussed before you today will ultimately lead you all to find that one, a new trial is warranted and slash or that an elimination or remediator of the damages that were entered in this matter, an elimination or remediator of these damages is warranted as well. This case was a battery case. It took place, the alleged battery took place in 2015. It stems from the reality television show, She's Got Game. She's Got Game is based upon the appellant whose moniker is The Game. He endeavored upon a reality TV show where he was courting a caravan of several women who followed him across the country as he sought and looked for love. Hence the title, She's Got Game, the winner of the reality television show, would have been deemed to have game, if you will, by succeeding to win the show and find her love match with Mr. Taylor. Your honors. Maybe we should be particular about the issues here because obviously it's a colorful background but one of the things, as I understand, you're complaining about is the district court's decision not to grant a continuance on what was essentially the second day of the trial. That's a matter over which district court judges have tremendous discretion to manage the trial, to go through, figure out who's been inconvenienced and explain to me why the district judge abused that discretion. Yes, your honor. District trial judges do have discretion. However, it is our position that there was an abuse of discretion and when actual prejudice is, in addition to that abuse of discretion, when there is actual prejudice, the Seventh Circuit has held that upon that finding of actual prejudice to a party, that that warrants the reversal or the finding that the court abused its discretion. So can I just make a couple of points? Certainly this was a civil trial and it's not like a criminal case. People can either be there for their civil trials or they can allow their agent, their lawyer to be there and represent them. Secondly, I don't understand why if there was some medical issue preventing travel to Chicago, a video appearance wouldn't have done just as well, which the judge allowed for a different witness. So I'm skeptical that the judge was so far off on his assessment of prejudice that we ought to second guess it. And notice I'm not saying would I have decided one way or the other, but we're asking did the district judge come to a decision somehow in the boundaries of rationality? To begin, your honor, by continuing the trial, and I do agree with you, honors, in a civil trial, an agent, counsel, has the right to be present for a party. And represent his interests fully. Absolutely. However, if you look at the comments that were raised by the trial judge, in the course of my career, and I'm paraphrasing, although I've done over at least 36 trials, and never in my 36 trials have you seen, Judge Feinerman was very fair throughout the course of proceedings until Mr. Taylor did not make an appearance. And hence, his actions. By proceeding to the trial, Mr. Taylor was deprived of the right of fully presenting an affirmative defense. Why didn't he ask for permission to testify by video? Your honor, even the witness who testified via video, that was a scramble, if you will. But it wasn't impossible, obviously. No, your honor, it arguably would not have been impossible, but with the conditions that Mr. Taylor was in, through the procedures, the medical procedures that he had, he did have oral surgery on his mouth. He had a root canal, which a lot of people have had. He may not be your most comfortable moment, but you can function. And you know, when Mr. Taylor proceeded to, or when the trial proceeded without Mr. Taylor, it led to a harmful adverse jury instruction that was admitted against objection. That's because the district judge made a credibility finding about Mr. Taylor's reason for not appearing. Now, are you inviting us to make a fresh finding of fact on that? The judge thought it was, he looked at other indications that Mr. Taylor was out partying and thought that he was not being given a straight story. And yes, and I think that that's important for the court to look at, because there was no testimony. What was presented was by opposing counsel. And opposing counsel should not be able to testify on their behalf. Opposing counsel presented what was a Snapchat, a purported Snapchat, that did not have Mr. Taylor in it. It did not have Mr. Taylor speaking in it. Therefore, what was presented to the court was a social media mechanism, Snapchat, which was to indicate that Mr. Taylor was out partying. However, if he was out partying but was not seen in the video, he was further not seen, he was not seen speaking in the video, it was put forth before the court that Mr. Taylor has people operate his account. In fact, counsel who put forth this piece of evidence that the Snapchat was operating also stated before the court that Mr. Taylor, while he was having his procedure done, was being filmed. Therefore, if he's being filmed while he's having his surgery, that further gives credence to the fact that Mr. Taylor has other people who operate this social media Snapchat account for him. And there was never put forth anything before the court that Mr. Taylor was actually in these videos that were put forth by the plaintiff. They were reflected in the Snapchats. Yes, they were reflected in the Snapchat. So it's not just the plaintiff's lawyer standing up there and saying, oh, I think he was partying. There were the Snapchats. The Snapchats that were Snapchats of no individual, Your Honor. There was no individual present. Mr. Taylor was not present. Your Honor, I could make a post right now on Instagram or any social media and say, I'm in Miami. My office is in Miami. But you all both know I'm here. Everyone, all you honors know I'm here in Chicago. But there's nothing to stop me from saying, I'm in Miami, and if you didn't know any better, you would believe that I'm in Miami. Why? Because my Instagram, my social media told you that. But that is not fact. Social media is social media. It is entertainment. You know. I would like to discuss further why it was unreasonable, Your Honor. Judge Finerman was presented with a letter from Dr. William Dorfman. He was further presented with teleconference testimony of Dr. Fred Monopore. So how much of this was verified? Did he get affidavits from any of these dentists or, for that matter, from Mr. Taylor? Or was this all just people throwing stuff on the wall? We'll see what would stick. There wasn't things thrown on the wall. An effort was attempted to get an affidavit from Mr. Taylor at the time. I was trial counsel at the time. I was told Mr. Taylor was under anesthesia and was not able to go forward with the declaration at that time. A declaration was provided by the dentist. I thought it was unsworn. But maybe you can correct me if I'm wrong. The testimony when Dr. Monopore spoke, that was just an oral teleconference. But Dr. Monopore did have a declaration that was also signed regarding the continuous that was in support of the defendant's motion for continuance. Do you want to say anything about the bus tape before you sit down? Yes, Your Honor. Briefly before I get into that, holding that there was no emergency when his Honor, despite all of his credentials, his Honor is not a doctor. His Honor is not a doctor and his credentials are that of the legal field. Also, ruling without any supporting testimony or evidence that the defendant was partying based on Snapchat posts was further unreasonable. In regards to the video, Your Honor, it is our position that the omission of the video was the prejudicial value of the video outweighed its probative value. So did you make clear to Judge Fineman that you were making a Rule 403 objection, which you've just described, objection to the video? I believe the plain language that was stated to Judge Fineman was the prejudicial value outweighed the probative value. So therefore, while Rule 403 was not directly quoted, the exact language of Rule 403, which is the prejudicial value, was directly quoted. I'll tell you, I watched the video. It's only a couple of days later and it includes Ms. Rainey's repeated effort to discuss the incident, the battery incident I'll call it, with Mr. Taylor. So I certainly couldn't criticize it on relevance grounds. And in fact, sometimes some of the most compelling evidence is both what you can call compelling, you can call it prejudicial, whatever label you want to put on it. But just because it's unfavorable to the other side doesn't necessarily mean you've got a Rule 403 objection. Well, when you look at the video combined with the weight of the evidence, the verdict going against the weight of the evidence, during that video… Well, I don't know why you think the verdict went against the weight of the evidence, but just focusing on this video, it's a contemporaneous conversation of the two people involved in the incident about the incident. And so these are statements of parties. If you want to start thinking about hearsay, they are… Actually, he seems to admit that he did all of these things in the video. She's clearly upset about the whole thing. I don't know why it was, again, outside the boundaries for the district court judge to admit that video. Going back specifically to that video, that video did not make it any more probable that what occurred on that bus days later led to the battery that was alleged to have happened to Adriana's… They're talking about the battery incident. They're talking about how it arose. They're talking about how she's dragged out of her room. They're talking about what he did. I don't know why that's not, you know, like standing up and having a discussion about it. Well, Your Honor, we would dispute that Mr. Taylor actually admitted to anything. In fact… He keeps yelling at her for, why did you tell the crew about this? I told you not to tell anybody. About this. And that aspect, this is ambiguous. The this, which his testimony would corroborate, had he been able to testify, the this was not the battery. The this was him going out. In the context, Mr. Taylor, this outing, Ms. Rainey, the appellee, had been bullied on the show. Mr. Taylor took it upon himself to take her out, give her a night on the town. She was not supposed to tell the staff, the crew, or anyone else that she was going out on this night of the town because this was a privilege. This night on the town was a privilege. That was the this. The this was not the battery. And had Mr. Taylor had the opportunity to actually testify, those comments, along with many of the other vile and slang innuendo that you all heard and saw on that video, would have been able to be explained. In fact, even during that video, one of the key critical things is the plaintiff actually makes a statement against interest. If you listen to the video, she says, that is not what bothered them. The elements of a battery, and I'll briefly finish so I can have some time for rebuttal, but the elements of a battery consisted of a touching, the touching needed to be offensive, and the touching needed to cause a plaintiff harm. The plaintiff, Ms. Raine, testified, or stated, excuse me, in that video, that's not what bothered her. What bothered her was that people were taking pictures. So even if you find that this did occur, and that Mr. Taylor was not credible, his statement, her statement, that that's not what bothered her, means that by law, if she was not offended and not bothered by this purported touching, even though we solely dispute that a touching occurred, but if a touching was not offensive, if it did not bother her, then as a matter of law, you do not have a battery. Okay, why don't you save your last minute then, and we'll hear from Mr. Cassell. Good morning, Your Honors. Paul Cassell for Ms. Priscilla Raine. With me at council table is Brad Edwards and Brittany Henderson, who tried the case in front of Judge Finerman. I'd be glad to answer any questions you have, just on the issue of the continuance. I think there needs to be just a few words said about the context here. Judge Finerman was dealing with, as he put it, the totality of circumstances of Taylor attempting to subvert litigation. From literally the first docket entry in the district court, there was a pattern of evasion of service process. There were three process servers, or five process servers in three different states. One had gone 41 times to try to serve Mr. Taylor. You've seen in the record difficulties there. Repeated requests for continuance. Mr. Taylor did not want to come to Chicago because he feared for his safety due to the high level of gun violence, and violated the sentencing procedure, or the settlement procedure that had been set up. It was against that backdrop that lo and behold, at 6 p.m. on Sunday night, there's suddenly a dental emergency, which is not communicated to Judge Finerman, and not the next day, Monday, but Tuesday. So Monday was jury selection? Yes. There was the jury pool from all over the northern district of Illinois. Jury selection was going on. Mr. Williams was representing to Judge Finerman that my client will be here tomorrow, which turned out, of course, to be false. So it's against that backdrop. I think you have to evaluate these issues. And the only evaluation I think has been suggested is whether the factual findings were clearly erroneous, and the judge then somehow acted completely outside the bounds of discretion. It seems to me that the judge, to the contrary, acted completely within his discretion, concluding factually this was a ruse, indeed one of the worst ruses he'd ever seen. I'd be glad to answer any factual questions on that. How important is that finding? I mean, certainly, it wouldn't surprise me, after all of these years here, to see any district judge say that, functionally, the second day of a trial is just too late to have a continuance. And normally, we would say, sure, you've assembled the jury from all over the relevant area, and people have been inconvenienced, and witnesses have been brought in, and so on and so on. Does it matter if the judge was unduly harsh or irritable when he found that the dental procedure was a ruse? I guess the question that you're asking is whether he took appropriate steps to follow up what was going on. Judge Fineman, as you see throughout this record, said, look, I'm making this finding now, but if you have additional information, you want me to consider. So it's not clear to me the record... So you don't think he shut things off, or just kind of, because he was angry, came to an unsupported finding of fact on the ruse? To the contrary. He said, if you have additional information, if you have an affidavit from your client under oath, I'd like to look at that. So am I right that there was no affidavit, either from Mr. Taylor under oath, about this dental business, or either of the dentists? I guess there's a phone call made to one of the dentist offices. Yeah, if you look at the appendix at pages 119 and 120, you'll see the two documents. Page 120, Dr. Monacourt says, declaration under penalty of perjury at the top, but that is a very truncated affidavit about just the medical procedure that was performed, the root canal. So I think that doctor provided something that indicates a root canal procedure was provided. What was never forthcoming, though, was an affidavit under oath from Mr. Taylor that he intended to show up at trial. And you'll recall, apropos of your question, was Judge Finerman closing the door? There were then some additional submissions of plane tickets and hotel rooms, and once again, the story did not line up. There was the one hotel room at a rather modest hotel for four people. Correct. And the dates didn't work either. The purported plan was for Mr. Taylor to fly out at 11 p.m. Monday night, arrive in Chicago at 5 a.m., be there Tuesday, Wednesday, one-night hotel, for what was projected to be a six- to seven-day trial, where his testimony for the defense presumably would have come at the end of the trial. It's also important to recall that he was actually, his testimony was introduced, his deposition testimony was introduced. The judge made a finding of fact that if he had shown up, he probably would have been the worst witness for the defense because there would have been so many contradictions exposed. He would have been required to testify to his wealth because punitive damages were at issue, and he had refused to answer those questions. So the record is just crying out that this was a tactical maneuver that is now being repackaged for your consumption as some sort of a cranky judge, when in fact the judge, I think, behaved very reasonably, very appropriately, and repeatedly asked for additional information from Mr. Taylor, only to not receive that additional information. So what about the bus tape? The bus tape, let's frame the issue here. The issue is a rule of evidence, an evidentiary call that the district judge made, balancing probative value versus prejudice. Probative value is, quote, extraordinarily probative, close quote. It was the finding of fact made by the district court judge, and this is clearly correct. Remember, this was a sexual battery case in which Mr. Taylor denied that the battery occurred. Ms. Rainey, the victim, said it did occur. And so how is that going to be sorted out by the jury? This is the first interaction between the assailant and his victim, 48 hours later, and fortunately for the jury, there's no dispute about what happened during this interaction. It's video recorded. And so the jury has not only the words... Was this being done by the film crew that just was filming the whole She's Got Game thing? Correct. This was part of the reality program, the reality of the social drama, I guess, inherent in the situation. But fortunately for the jury in this case, they're able to see the facial expressions of Mr. Taylor. They're able to see what he says. There's been some suggestion that what exactly was she talking about? The quote was, she said, my vagina was, quote, not for you to touch, close quote, and that was part of the discussion that occurred. You'll notice, as you already have from viewing the videotape, that there's no direct denial. Instead there are, be a woman and don't talk about this, various other responses, not directly denying that the battery took place. And in a case where the central issue is whether the battery took place, it's obvious to see why Judge Fineman said this is extraordinarily probative. Now what is the prejudicial effect? It's still unclear to me reading the brief from the other side. I understand this might be harmful to the defendant's case, but what I don't understand is how it would be unfairly harmful. The suggestion is, I guess, strong language is being used, some profanity being expressed on both sides of the equation. But again, this was in a reality TV setting, where both sides were speaking very frankly and very strongly. It's hard to see how that kind of a dialogue could somehow be so unfairly prejudicial to keep out the pivotal piece of evidence in the case. So once again, the issue is not whether, how you would balance these issues in the first instance. The issue is whether Judge Fineman, very conversant with facts of the case, having looked at the video, having watched the witnesses and the projected testimony, his conclusion was that this was inbounds. And the only issue for you all is whether that was so outrageous that you should overturn what's essentially a factual fact. I will comment that the language is a lot like the language that appears on quite a few tapes that the government uses in drug cases. It's not something we haven't heard before. I'm from out of town, but my understanding is that folks in Chicago occasionally use language like that. They don't in Utah, is that right? I'm happy to answer any other questions about the record. I think the briefing adequately presents our position. Right. The only thing, although Mr. Williams didn't get to it, is the topic of damages. And I'll invite you to say whatever you want to about that. He simplifies in his brief saying it was a $1.1 million verdict. The verdict was $1,130,100. And it was comprised of eight separate components. One of the components was a defense verdict. That was for loss of past normal life. The jury elected towards $0. Loss of future normal life, they awarded $500,000. And this is repackaged in the defense brief as, oh, that was some kind of emotional distress. Actually, I think the record makes pretty clear that was lost income or more precisely a lost business opportunity. There was a business, the Lux Boutique, which was up and running. Shauna Richardson, who was the business partner of Ms. Rainey, testified about that. And in the wake of the sexual battery with the collapse of Ms. Rainey's well-being, that business also collapsed. So I think what the jury decided was here was a business up and running and if you conservatively say maybe $10,000 a year would have come from that business over the course of a lifetime, mortality tables were entered into evidence, that would be $500,000. So that piece of the verdict is not an emotional distress piece. That's an economic damage calculation piece, which I think it means if you're starting to look at comparing other verdicts, you have to look at lost business opportunities rather than other things. Do we really have to do a comparison here? Isn't this governed by Illinois law? So the Seventh Circuit has been less than completely clear on this particular issue. And at some point the court, I would submit, will want to clear this up. This is not a good vehicle for doing so because the four cases that are at issue have not even been cited by Mr. Taylor, so we haven't had an opportunity to confront the arguments. However, if you want our position, we believe that the case of Nahum from this court in 2006 was correct. This court said that to engage in some sort of comparison would we essentially involve a substantive decision under Erie then that would be controlled by Illinois law because there would be, I think, an inevitable tendency to apply comparisons to reduce plaintiff's verdicts. I suppose theoretically you could say, we found something where the verdict has to come up, but that would be extremely rare. That's what Nahum says. The two other cases that are out there, Applin and Judd C. Johnson, are both bench trial cases. And in a bench trial, I think a federal district court judge might be required by Rule 52 of the Federal Rules of Civil Procedure to provide the basis for the reasoning including other comparative verdicts that are out there. So at some point you're going to have to decide but this case probably isn't the best vehicle because Judge Finerman, anticipating that there were competing points of view on that said, look, either way you go, it's still a verdict that should be affirmed because this is consistent with other verdicts and in any event it's not really clear that Illinois law permits it. If there are any other questions, I'd be happy to answer them. Otherwise, Ms. Rainey asks you to affirm the judgment that the jury reached after carefully considering all the evidence. Alright, thank you. Mr. Williams, I think you have a minute left. A minute and seven seconds. I'd like to clarify a few things that were stated. As far as the hotel rooms and the flights that didn't make sense. That was inaccurate. What happened was the hotel rooms were first presented to the judge, a set of hotel rooms. They were presented to me, I gave that to the judge. After his honor made his comments that he did in the record, then further hotel rooms were provided. The hotel rooms did match up with the stays and the amount of people as well as the flights. There were flights and hotels for all the parties. Furthermore, there was no denial. The fact that Mr. Taylor did not give an affirmative denial in his deposition, he was asked by plaintiff's counsel if he would say anything if he was accused of that. What he said of the appendix, page 38 was, I probably wouldn't say anything I would just think that's a little preposterous. He states in his deposition he wouldn't deny if he was accused, he would think that's preposterous. If I may, I know I have 5 seconds, but if I could just finish my last thought, if their honors would give me permission. University of Florida, Florida State School of Law admitted to the Florida Bar 2002. Those are the credentials of plaintiff's counsel, Brad Edwards. Yale College, 1987 Stanford School of Law, 1991 Those are the credentials of Judge Feinerman. University of Miami, 2010. University of Miami School of Music, 2014. University of Miami School of Law, 2014. Admitted to the Florida Bar, 2014. Those are my credentials. UCLA, 1980. Where are we going with this? I'll be there in 20 seconds, your honor. University of the Pacific School of Dentistry, 1983. Those are the credentials for Dr. Dorfman. UCLA USC School of Dentistry, part-time faculty at USC Oscar School of Dentistry, 19 years. Dr. Fred Monoport. As our honors can see, none of the attorneys involved in this case, none of the judges, have a medical background. Despite how established and esteemed my opposing counsel and Judge Feinerman may have been, there is no background in the medical field. Okay, I think we have your point. Thank you, your honor. Thank you very much. Thanks to both counsel. We'll take the case under advisement.